**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: APPLE INC. GAME APPS
LOSS RECOVERY ACT LITIGATION** | **MDL Docket No. _____** |

**BRIEF IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION FOR TRANSFER OF
ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR
<u>CENTRALIZED PRETRIAL PROCEEDINGS</u>**

# **TABLE OF CONTENTS**

Pages

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

ARGUMENT ........................................................................................................................5

I.      TRANSFER TO A SINGLE DISTRICT FOR CENTRALIZED PRETRIAL
        PROCEEDINGS IS APPROPRIATE UNDER 28 U.S.C. § 1407 ......................................5

        A.      The Six Actions—and Nine Anticipated Actions—Involve Multiple Common
                Issues of Fact.........................................................................................................5

        B.      Centralization Will Promote the Convenience of the Parties and Witnesses as
                Well As Judicial Efficiency and Justice.................................................................8

        C.      § 1404 Transfers or Informal Coordination Would Be Unlikely to Achieve the
                Convenience, Efficiencies, and Consistent Rulings Achievable Through
                Centralization. .....................................................................................................10

II.     THE NORTHERN DISTRICT OF CALIFORNIA IS THE MOST APPROPRIATE
        TRANSFEREE DISTRICT ........................................................................................12

        A.      The Litigation's Center of Gravity Is the Northern District of California.............13

        B.      The Northern District of California Is Best Positioned to Ensure Expeditious
                Handling of the MDL............................................................................................15

        C.      In the Alternative, The Relative Caseloads Favor Centralization in The Central
                District of California. ..........................................................................................17

CONCLUSION....................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air West, Inc. Sec. Litig.*,
  384 F. Supp. 609 (J.P.M.L. 1974)........................................................................5

*In re Anthracite Coal Antitrust Litig.*,
  436 F. Supp. 402 (J.P.M.L. 1977)......................................................................15

*In re Apple Inc. Device Performance Litig.*,
  291 F. Supp. 3d 1371 (J.P.M.L. 2018)...............................................................14

*In re Apple iPhone 3G Prods. Liab. Litig.*
  630 F. Supp. 2d 1382 (J.P.M.L. 2009)...............................................................14

*In re Apple iPhone 4 Prods. Liab. Litig.*,
  746 F. Supp. 2d 1357 (J.P.M.L. 2010)...............................................................14

*In re Apple iPod Nano Prods. Liab. Litig.*,
  429 F. Supp. 2d 1366 (J.P.M.L. 2006)...............................................................14

*In re Auto Body Shop Antitrust Litig.*,
  37 F. Supp. 3d 1388 (J.P.M.L. 2014)...................................................................9

*In re Baycol Prods. Liab. Litig.*,
  180 F. Supp. 2d 1378 (J.P.M.L. 2001)...............................................................15

*In re: Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*,
  896 F. Supp. 2d 1339 (J.P.M.L. 2012).........................................................12, 15

*In re Cardiac Devices Qui Tam Litig.*,
  254 F. Supp. 2d 1370 (J.P.M.L. 2003).................................................................7

*In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*,
  26 F. Supp. 3d 1394 (J.P.M.L. 2014)...................................................................9

*In re Chrysler LLC 2.7 Liter V-6 Engine Oil Sludge Prod. Liab. Litig.*,
  598 F. Supp. 2d 1372 (J.P.M.L. 2009)...............................................................11

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013).........................................................................................6

*In re: Countrywide Fin. Corp. Mortg. Backed Sec. Litig.*,
  812 F. Supp. 2d 1380 (J.P.M.L. 2011)...............................................................17

ii

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
403 F. Supp. 2d 1358 (J.P.M.L. 2005)...........................................................................12, 13

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
325 F. Supp. 3d 1362 (J.P.M.L. 2018)...................................................................................12

*In re Generic Pharm. Pricing Antitrust Litig.*,
No. MDL 2724, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017) ...........................................8, 11

*In re German Auto. Manufacturers Antitrust Litig.*,
278 F. Supp. 3d 1373 (J.P.M.L. 2017)...................................................................................16

*In re Glob. Crossing Ltd. Sec. Litig.*,
341 F. Supp. 2d 1357 (J.P.M.L. 2004)...................................................................................16

*In re Inclusive Access Course Materials Antitrust Litig.*,
No. MDL 2946, 2020 WL 4670703 (J.P.M.L. Aug. 11, 2020) ..............................................9

*In re iPhone/iPad Application Consumer Privacy Litig.*,
802 F. Supp. 2d 1363 (J.P.M.L. 2011)...................................................................................14

*In re Janus Mut. Funds Inv. Litig.*,
310 F. Supp. 2d 1359 (J.P.M.L. 2004)...................................................................................15

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
24 F. Supp. 3d 1361 (J.P.M.L. 2014).......................................................................................5

*In re: Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
24 F. Supp. 3d 1366 (J.P.M.L. 2014).......................................................................................7

*In re: Nat'l Hockey League Players' Concussion Injury Litig.*,
MDL No. 14-2551, 327 F.R.D. 245 (D. Minn. 2018) .............................................................5

*In re: Nebivolol (%2C040) Patent Litig.*,
867 F. Supp. 2d 1354 (J.P.M.L. 2012).....................................................................................7

*In re Nine W. LBO Sec. Litig.*,
464 F. Supp. 3d 1383 (J.P.M.L. 2020).......................................................................... *passim*

*In re Oil Spill by "Amoco Cadiz Off Coast of France on Mar. 16, 1978*,
471 F. Supp. 473 (J.P.M.L. 1979)..........................................................................................13

*In re Plumbing Fixture Cases*,
298 F. Supp. 484 (J.P.M.L. 1968)..........................................................................................10

*In re Rail Freight Fuel Surcharge Antitrust Litig*,
MDL No. 1869, No. 18-7010, 2019 WL 3850581 (D.C. Cir. Aug. 16, 2019) .........................5

iii

*In re Roadway Exp., Inc. Employment Practices Litig.*,
384 F. Supp. 612 (J.P.M.L. 1974) ..............................................................9

*In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*,
978 F. Supp. 2d 1379 (J.P.M.L. 2013) ...............................................10, 11

*In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig. (No. II)*,
289 F. Supp. 3d 1335 (J.P.M.L. 2018) ......................................................16

*In re Trade Partners, Inc., Inv'rs Litig.*,
493 F. Supp. 2d 1381 (J.P.M.L. 2007) ........................................................5

*In re Tribune Co. Fraudulent Conveyance Litig.*,
831 F. Supp. 2d 1371 (J.P.M.L. 2011) ........................................................8

*In re: U.S. Foodservice, Inc., Pricing Litig.*,
528 F. Supp. 2d 1370 (J.P.M.L. 2007) ........................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ................................................................................6

**Statutes**

28 U.S.C. § 1404(b) ...................................................................................11

28 U.S.C. § 1407(a) .....................................................................................5

Communications Decency Act of 1996, 47 U.S.C.A. § 230 .........................2

Ala. Code § 8-1-150 .....................................................................................4

Conn. Gen. Stat. § 52-554 ............................................................................4

Ga. Code Ann. § 13-8-3 ...............................................................................4

N.Y. GOL § 5-421 ........................................................................................4

Ohio Rev. Code § 3763.02 ...........................................................................4

Tenn. Code Ann. § 29-19-104 ......................................................................4

**Other Authorities**

Fed. R. Civ. P. 23(b)(3)................................................................................6

# INTRODUCTION

Apple Inc. ("Apple") seeks to transfer various actions brought against it for centralized pretrial proceedings in the Northern District of California pursuant to 28 U.S.C. § 1407. Plaintiffs' counsel agree to centralization but contest the proposed forum. Currently, Apple is the sole defendant in six virtually identical putative statewide class actions pending in six different federal districts across the country. Plaintiffs' counsel have stated that they intend to file at least nine more actions in nine different states and districts. Additional tag-along actions may be imminent.

The six pending actions advance claims that arise from a common set of facts. All named plaintiffs allege that they downloaded one or more of a list of "the most popular" 200 third-party apps—the same 200 apps identified in each complaint—available on Apple's App Store. *See* All Complaints (attached) ¶ 10. The App Store is an online marketplace platform where third-party developers sell and share apps to and with consumers. The named plaintiffs seek to represent large classes of individuals, including those who may have downloaded some combination of others of the hundreds of apps. According to plaintiffs, each of the apps at issue in these six lawsuits are simulated casino-style games, such as bingo, roulette, blackjack, poker, keno, craps, and slots. *Id.* Once users download an app from the App Store, the third-party developer allows users to purchase enhancements, often referred to as "tokens" or "gems," which give the player additional opportunity to play the game. *Id.* Claiming this exchange of gems for further play opportunity constitutes illegal gambling, plaintiffs now seek from Apple alone "a refund of all money paid." *Id.* at Prayer for Relief. As a basis for their refund, plaintiffs rely on state loss recovery statutes prohibiting illegal gambling. Because the complaints are essentially word-for-word facsimiles of each other, centralization will promote convenience of the witnesses and parties, judicial economy,

1

and the efficient conduct of the actions by coordinating discovery and preventing potentially conflicting rulings in these copycat cases.

Given the extensive overlap in factual allegations, plaintiffs likely will seek identical discovery in each case—discovery about the same App Store guidelines and terms and conditions and the nature of Apple's relationship with the developers of the same 200 third-party apps.[1]  These apps were developed by dozens of third parties, many of whom are located outside the United States. Nothing warrants burdening these third parties with multiple, duplicative discovery obligations in different jurisdictions with potentially different rules. Nor should multiple courts face duplicative objections and motion practice by dozens of third parties—and by Apple—as to foreign discovery. Centralization will minimize the burden of discovery on all parties and ensure that the parties and third-party app developers do not face competing discovery obligations.

Beyond discovery, non-MDL motion practice in each of these cases would require six courts to evaluate common issues of fact. Apple will assert common defenses to the actions, including for federal immunity under the Communications Decency Act of 1996, 47 U.S.C.A. § 230 ("CDA"). Evaluating the application of the CDA alone will require all six courts to assess the factual predicate to its applicability, including whether Apple is a provider or user of an interactive computer service, whether the complaints allege a claim against Apple as a "publisher" of the challenged apps, and whether the apps were provided by a third party other than Apple. *Id.*

And beyond the applicability of the CDA, Apple will seek critical pretrial rulings, including on class certification. At that phase, six courts will have to assess the same Rule 23 issues, such as

---

[1] Although Apple recognizes that plaintiffs will likely seek discovery that will be substantially similar across all Actions, Apple reserves the right to assert any and all applicable objections to discovery requests the plaintiffs may issue. Apple's position, for purposes of this petition, is that centralization will streamline any requests, responses thereto, and disputes that arise regarding the propriety of such requests.

whether common questions of law or fact predominate over individual questions and whether a class action is the superior method of adjudicating the issue. Apple also will have common defenses to the merits that it intends to raise on summary judgment, including defenses arising from its terms and conditions with plaintiffs and the appropriateness of pursuing Apple for content developed by third parties. Absent centralization, six different courts would be burdened with duplicative motion practice on Apple's defenses. The courts and the parties will benefit greatly from briefing and deciding these issues in a coordinated manner, and without requiring six (or more) districts to address the same issues.

Centralization in the Northern District of California—which is the litigation's center of gravity—is particularly appropriate. The Northern District of California has a strong connection to these cases because: Apple's headquarters is located there as are the majority of documents and likely witnesses; and upon download and use of the apps at issue, plaintiffs agreed to litigate any claim or dispute with Apple in the State of California. Further, the judges of the Northern District of California have substantial experience with multidistrict litigation and with Apple and the complex technological software and products at issue as well as the relationships between Apple, its third-party app developers, and the users of those apps. In the alternative, the Central District of California, which has relatively few MDLs currently and disposes of cases more quickly than judges in the districts where actions are pending, is a suitable venue for transfer and centralization because it is geographically close to the litigation's center of gravity.

## BACKGROUND

Between October 21, 2020 and October 23, 2020, plaintiffs filed six putative class actions against Apple in six different federal districts (the "Actions").[2] The Actions are largely identical. The named plaintiffs are six individuals who allegedly used certain mobile apps created by third-party developers that were made available to consumers through Apple's App Store. Plaintiffs allege that these games "constitute illegal gambling" and that Apple unlawfully "promotes, enables, and profits" from these apps. *See* All Complaints at 1. Pursuant to his or her state's Loss Recovery Act,[3] each plaintiff seeks to recover money spent on in-app purchases while using the third-party developer's game app.

Each case seeks to certify the following statewide class:

> All [] residents who downloaded, played, and paid money for additional coins within games from the Apple App Store that featured slots, roulette, blackjack, poker, keno, craps, and other kinds of casino-style gambling games, bingo, or simulations thereof, where the player had a chance to win coins or other means to play for additional periods of time, during a period commencing three months before the filing of this complaint and continuing to a date to be set by the Court following certification. All employees of the Court, and plaintiff's counsel and their families are excluded.

*Larsen*, ¶ 22 (Alabama residents); *Custodero*, ¶ 22 (New York residents); *Workman*, ¶ 22 (Connecticut residents); *Viglietti*, ¶ 22 (Tennessee residents); *Payton*, ¶ 23 (Georgia residents); *McCloskey*, ¶ 23 (Ohio residents).

---

[2] *Larsen v. Apple, Inc.*, No. 2:20-cv-01652 (N.D. Ala. Oct. 21, 2020); *Custodero v. Apple, Inc.*, No. 5:20-cv-01320 (N.D.N.Y. Oct. 22, 2020); *Workman v. Apple, Inc.*, No. 3:20-cv-01595 (D. Conn. Oct. 22, 2020); *Viglietti v. Apple, Inc.*, No. 2:20-cv-02773 (W.D. Tenn. Oct. 22, 2020); *Payton v. Apple, Inc.*, No. 1:20-cv-04326 (N.D. Ga. Oct. 22, 2020); *McCloskey v. Apple, Inc.*, No. 3:20-cv-00434 (S.D. Ohio Oct. 23, 2020).

[3] Ala. Code § 8-1-150; Conn. Gen. Stat. § 52-554; Ga. Code Ann. § 13-8-3; Ohio Rev. Code § 3763.02; N.Y. GOL § 5-421; and Tenn. Code Ann. § 29-19-104 (collectively, the "Loss Recovery Acts").

All of the Actions are in the earliest stage of litigation; Apple has not yet filed any responsive pleadings. Prior to filing this Motion, counsel for Apple met and conferred with plaintiffs' counsel. Plaintiffs' counsel has informed Apple that they intend to file up to nine additional federal actions, in nine separate federal districts, involving the same factual allegations. Apple understands that plaintiffs agree to MDL treatment but contest the Northern District of California as an appropriate venue.

## ARGUMENT

## I.   TRANSFER TO A SINGLE DISTRICT FOR CENTRALIZED PRETRIAL PROCEEDINGS IS APPROPRIATE UNDER 28 U.S.C. § 1407

Centralization of pretrial multi-district proceedings in a single district through an MDL is appropriate when (1) actions pending in different federal courts involve "one or more common questions of fact"; and (2) coordination "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). *See In re Nine W. LBO Sec. Litig.*, 464 F. Supp. 3d 1383, 1385 (J.P.M.L. 2020) (holding that centralization is appropriate if it would "eliminate duplicative discovery; prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary."). The Actions satisfy these requirements and should be transferred for centralized proceedings.

### A.   The Six Actions—and Nine Anticipated Actions—Involve Multiple Common Issues of Fact.

The Panel is authorized to transfer and centralize cases that involve "common questions of fact." 28 U.S.C. § 1407(a). Section 1407 "does not require a complete identity or even majority of common factual issues as a prerequisite to centralization." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 24 F. Supp. 3d 1361, 1363 (J.P.M.L. 2014) (quoting *In re Park W. Galleries, Inc., Litig.*, 887 F. Supp. 2d 1385, 1385 (J.P.M.L. 2012)). Rather, common factual

questions are presumed "when two or more complaints assert comparable allegations against identical defendants based upon similar transactions and events." *In re Air West, Inc. Sec. Litig.*, 384 F. Supp. 609, 611 (J.P.M.L. 1974) (citations omitted).[4]

The Actions assert identical legal claims and factual allegations, with only minor variations in the language used to account for the respective named plaintiffs and the text of the relevant state statute invoked. In support of their claims, each plaintiff alleges that he or she (1) lost specific amount(s) of money, (2) in a gambling transaction, and (3) filed suit for recovery of his or her losses within the statutorily prescribed time period. *See* All Complaints, Count I.

The Actions share numerous factual allegations concerning Apple's mobile operating system (iOS), the development of the apps at issue, the operation and functionality of the apps and in-app purchases, and Apple's guidelines, agreements, review, and publication of the games on Apple's App Store. *See* All Complaints at Count I. Moreover, claims accusing app-based games of violating state gambling statutes are part of an emerging area of the law, in which several plaintiffs' firms have filed cases against developers and publishers in recent months. If the Actions were to proceed separately, six (or more) different courts would be required to address common factual issues in this new legal area, such as:

---

[4]  This inquiry is quite different from the class certification inquiry required by Federal Rule of Civil Procedure 23. *See In re Trade Partners, Inc., Inv'rs Litig.*, 493 F. Supp. 2d 1381 (J.P.M.L. 2007) (centralization under Section 1407 appropriate even where individual questions of fact and law predominate for class certification purposes). Courts routinely deny class certification in multidistrict proceedings. *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig*, MDL No. 1869, No. 18-7010, 2019 WL 3850581 (D.C. Cir. Aug. 16, 2019); *In re Nat'l Hockey League Players' Concussion Injury Litig.*, MDL No. 14-2551, 327 F.R.D. 245 (D. Minn. 2018). Apple reserves all of its defenses to class certification, including, but not limited to, the absence of common questions susceptible to common answers, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), and the fact that common questions do not predominate over individualized questions, *see* Fed. R. Civ. P. 23(b)(3); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1436–37 (2013).

- The nature of in-app purchases made while playing third-party apps downloaded from the App Store;

- At what point in the process the user engages in a transaction involving Apple;

- The process for third-party app developers to submit their apps to the App Store for review, publication, and subsequent download and use;

- The nature of the game play in each of the 200 apps, including what can be played for free, what costs money, and when/whether a player ever "loses" under the statutory definition;

- The terms and conditions consumers agree to when playing the games;

- Whether the games constitute gambling;

- How the games vary from actual gambling apps;

- The nature of the financial arrangement between a third-party app developer and Apple; and

- The technological protections Apple provides consumers in making third-party in-app purchases.

*See* All Complaints, ¶¶ 6-16.

Apple will raise universal defenses to each Action at the motion to dismiss and, if necessary, class certification and summary judgment stages to defeat liability and damages. *See, e.g., In re: Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 24 F. Supp. 3d 1366, 1367 (J.P.M.L. 2014) (noting actions will involve similar defenses); *In re: Nebivolol (%2C040) Patent Litig.*, 867 F. Supp. 2d 1354, 1355 (J.P.M.L. 2012) (ordering centralization where "defendants are anticipated to raise similar arguments concerning … defenses"); *In re Cardiac Devices Qui Tam Litig.*, 254 F. Supp. 2d 1370, 1372 (J.P.M.L. 2003) (finding centralization necessary and listing shared factual questions to include defenses to the claims). For example, Apple anticipates arguing in defense against each Action that plaintiffs' claims are defeated by the terms and conditions applicable to plaintiffs use of the Apple App Store and third-

party apps, and Apple has federal immunity under the CDA. The benefits from a single, consistent ruling on each of these defenses—including availability of a federal preemption defense under a federal statute—is another strong ground supporting centralization, as set forth below.

**B.    Centralization Will Promote the Convenience of the Parties and Witnesses as Well As Judicial Efficiency and Justice**.

Transfer and centralization are necessary to avoid duplicative discovery, inconsistent pretrial rulings, and waste of judicial and party resources. *See, e.g., Nine W.*, 464 F. Supp. 3d at 1385. Because all of the Actions are still in the pleading stage and there is substantial overlap of factual allegations, transfer will create substantial efficiencies for the parties and the courts. *Id.*

Transfer is particularly appropriate because none of the Actions has moved past the pleading stage. *See, e.g., In re Generic Pharm. Pricing Antitrust Litig.,* No. MDL 2724, 2017 WL 4582710, at *2 (J.P.M.L. Aug. 3, 2017) (noting there is "ample scope to eliminate duplication and enhance the convenience of the parties, the witnesses, and the courts through coordinated proceedings in the MDL" where actions had not advanced beyond motion to dismiss); *Nine W.*, 464 F. Supp. 3d at 1386 (reasoning that "there has been no significant activity in any action such that transfer to another district would disrupt its efficient progress"). Here, Apple has not filed any answers or motions to dismiss, no court has held a Rule 26(f) conference, and no discovery has taken place.

The creation of an MDL would be more efficient for the courts and parties from the outset of these cases due to the overlapping allegations involved. The existence of at least six, and potentially more than 15, different lawsuits—all before different judges in different districts—in which the defendant will advance similar motions to dismiss on certain identical issues would be the opposite of efficient. *See In re Tribune Co. Fraudulent Conveyance Litig.*, 831 F. Supp. 2d 1371, 1371 (J.P.M.L. 2011) (noting "[m]otions to dismiss likely will be similar in these actions"

8

and ordering transfer and consolidation). In an MDL, in contrast, the parties can seek a case management order permitting the filing of a master complaint, to which Apple could address its arguments for dismissal of all claims and *only one* district court would be required to spend time at the pleading stage to resolve early dispositive motion practice.

Because the Actions share common factual allegations about Apple's conduct, if the matter survives a motion to dismiss, discovery will also overlap substantially and require: (i) gathering and producing the same documentary evidence, (ii) deposing the same or substantially identical Apple witnesses, and (iii) disclosing and deposing experts on the same subject matters. *See In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390 (J.P.M.L. 2014) (noting that transfer was appropriate to eliminate duplicative discovery when the actions shared "a common factual core"). Centralization of the Actions before a single court will allow a seasoned federal judge experienced in complex litigation to "formulate a pretrial discovery program" to avoid unnecessary duplication of discovery efforts. *In re: U.S. Foodservice, Inc., Pricing Litig.*, 528 F. Supp. 2d 1370, 1371 (J.P.M.L. 2007). This will conserve the resources of: (1) the plaintiffs, who will not each need to serve their own sets of discovery for each individual action; (2) Apple, who will not have to respond to multiple duplicative sets of discovery and have their experts and witnesses deposed multiple times on the same issues; and (3) the judiciary, who will not be burdened with multiple duplicative discovery and dispositive motions, risking inconsistent results.

Where, as here, the underlying actions are putative class actions, the argument for transfer and centralization in a single forum is strengthened. "[T]he existence of and the need to eliminate" the risk of inconsistent class certification rulings "presents a highly persuasive reason favoring transfer under Section 1407." *In re Roadway Exp., Inc. Employment Practices Litig.*, 384 F. Supp. 612, 613 (J.P.M.L. 1974); *see also In re Inclusive Access Course Materials Antitrust Litig.*, No.

9

MDL 2946, 2020 WL 4670703, at *1 (J.P.M.L. Aug. 11, 2020) (consolidating actions involving non-overlapping classes because "[c]entralization will eliminate duplicative discovery, the possibility of inconsistent rulings on class certification and other pretrial matters, and conserve judicial and party resources"); *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, 26 F. Supp. 3d 1394, 1395 (J.P.M.L. 2014) (granting transfer because "[c]entralization will … prevent inconsistent pretrial rulings (particularly as to class certification)"). Failure to coordinate the Actions before a single judge "would make possible, and perhaps probable, pretrial chaos in conflicting class action determinations which Section 1407 was designed to make impossible." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491–93 (J.P.M.L. 1968).

Here, plaintiffs propose an identical class definition (except as to geography) in six actions and that definition seeks to include consumers of the *same* 200 apps. It is simply inefficient for six separate courts to address six cases with such overlap.

**C.     § 1404 Transfers or Informal Coordination Would Be Unlikely to Achieve the Convenience, Efficiencies, and Consistent Rulings Achievable Through Centralization.**

As detailed in Section I.B, consolidation pursuant to Section 1407(a) would be convenient for the parties and efficient for the Court for several reasons. Equivalent convenience and efficiencies are far less certain through the transfer of individual cases under Section 1404 or through informal coordination.

As to potential Section 1404 transfer motions, there is no "reasonable prospect" that such motions would "eliminate the multidistrict character of the litigation." *In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1380–81 (J.P.M.L. 2013). *Schnuck Markets* involved a data breach potentially affecting an estimated 2.4 million customers. At the time of the hearing before the Panel, there were only four constituent actions in four districts. The

10

parties had filed a notice of settlement in the case then-pending in the district where defendant was headquartered. The defendant company objected to centralization, preferring to rely on its three pending Section 1404 transfer motions. A magistrate judge had written a report and recommendation for the Article III judge to grant one of the motions. Yet the Panel transferred the three cases to the district where defendant was headquartered and held there was no reasonable prospect that the Section 1404 motions would eliminate the multidistrict character of the litigation. *Id.*

In doing so, the Panel articulated two key factors. *First*, the Panel opined that relying on all three Section 1404 motions to be decided the same way was uncertain given the discretionary nature of Section 1404. *Id.* at 1380. *Second*, the Panel noted that the previous decisions in which it had deferred to Section 1404 transfer motions involved cases in fewer districts (two). Further, the Panel found that additional tag-along cases might be filed. *Id.*

Here, the facts weigh even more heavily in favor of centralization than did the facts in *Schnuck Markets*. *First*, unlike in that case, Apple has not filed any Section 1404 motion in any Action. Asking six (and potentially fifteen) separate district courts to exercise their discretion under Section 1404 to transfer actions would not only require briefing in each court and use of judicial resources in deciding that number of motions, it would provide no assurance that each court would exercise its discretion to transfer each Action in exactly the same way, or on the same time frame. *See* 28 U.S.C. § 1404(b) (permitting transfer "in the discretion of the court"). If any one court—or worse, multiple courts—decided not to transfer an Action, then the benefits of convenience, efficiency, and consistent rulings that are achievable with certainty through Section 1407 centralization would be lost. *Second*, there are even more Actions and districts involved here

11

than in *Schnuck Markets*. And additional tag-along actions are certainly possible since plaintiffs have conveyed their intent to file additional actions.

Centralization is also preferable to informal coordination where, as here, the Actions are nearly identical, and discovery will undoubtedly overlap because a single judge is able to streamline pretrial proceedings and make consistent rulings on discovery disputes, dispositive motions, and issues relating to experts. *E.g., In re Chrysler LLC 2.7 Liter V-6 Engine Oil Sludge Prod. Liab. Litig.*, 598 F. Supp. 2d 1372, 1374 (J.P.M.L. 2009) (ordering transfer in action with common counsel). As the Panel has recognized, only centralization can achieve this goal. *In re Generic Pharm.,* 2017 WL 4582710, at *2 ("informal coordination and cooperation among the parties and courts" is not "sufficient to eliminate the potential for duplicative discovery, inconsistent pretrial rulings, and conflicting discovery obligations").

## II.   THE NORTHERN DISTRICT OF CALIFORNIA IS THE MOST APPROPRIATE TRANSFEREE DISTRICT

A federal court in the Northern District of California is the most reasonable venue for centralization of the Actions. When deciding the appropriate transferee district for an MDL, the Panel considers, among other things: (1) the situs of evidence and the residence of the witnesses and parties—the litigation's center of gravity—and (2) the transferee forum's docket and its ability to manage the MDL, together with the district's familiarity with the actions and interest in serving as the transferee forum.  *See, e.g., Nine W.,* 464 F. Supp. 3d at 1385 (transferring to district that is "litigation's center of gravity"—even though no constituent actions were then-pending there); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 325 F. Supp. 3d 1362, 1364 (J.P.M.L. 2018) (transfer to district where Facebook is headquartered and relevant evidence and witnesses are likely to be located); *In re: Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*, 896 F. Supp. 2d 1339, 1340–41 (J.P.M.L. 2012) (selecting transferee district in which no actions were filed,

because the district enjoyed "favorable docket conditions" and had an "experienced transferee judge who is well-versed in the nuances of complex, multidistrict litigation"). Each of these factors strongly favor transfer to the Northern District of California.

**A.      The Litigation's Center of Gravity Is the Northern District of California**.

One of the most important considerations in selecting an appropriate transferee forum is determining which forum has the strongest "nexus" to the litigation. *See In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 403 F. Supp. 2d 1358, 1360 (J.P.M.L. 2005). A key factor in determining the strength of the nexus is the presence of a defendant's headquarters in the proposed district. *See id* (district where documents and witnesses likely to be found and where defendant was headquartered had "significant nexus to the litigation"); *In re: Nine W.,* 464 F. Supp. 3d at 1385 (same).

The Panel's recent decision in *Nine West* is instructive. There, the Panel transferred certain pending bankruptcy actions to the Southern District of New York for coordinated or consolidated pretrial proceedings. *Id.* at 1386. Although no constituent action was pending in that district, the Panel found that it was the "litigation's center of gravity" because the defendants, including Nine West, were headquartered there, the defendants had filed bankruptcy there, and relevant documents and witnesses were located there. *Id.* at 1385–86.

As in *Nine West*, this litigation's "center of gravity" is where defendant Apple is headquartered, and where the key Apple witnesses and evidence are located—the Northern District of California. Most of Apple's documents are anticipated to be retained or accessible in Northern California. Most, if not all, of the relevant Apple employees, such as those who are involved in the operation of the App Store and relationships with third-party apps, are located primarily in Northern California. Also, several of the third-party app developers are headquartered in Asia. To

13

the extent documents and witnesses are located throughout Asia, the Northern District of California would be a convenient U.S. forum due to its geographic location and relatively high volume of available flights to and from nearby airports. *See In re Oil Spill by "Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 471 F. Supp. 473, 478 (J.P.M.L. 1979) (centralizing and transferring to forum that is "more accessible to the foreign parties in this litigation than any other American forum"). In contrast, plaintiffs are not expected to have a significant volume of documents or non-California witnesses in this case.

Further, the plaintiffs' use of the App Store is expressly conditioned on the customer's acceptance of the App Store Terms and Conditions, including the clause specifying courts in the State of California as the exclusive venue for litigation of "any claim or dispute with Apple or relating in any way to [the customer's] use of the App and Book Services." Ex. A (App Store Terms and Conditions) at 14.

The Panel has often found that overlapping litigation involving Apple is most efficiently centralized in the Northern District of California, concluding that the Northern District of California "stood out" as an appropriate transferee court given Apple's presence in that district. *In re Apple iPhone 3G Prods. Liab. Litig.* 630 F. Supp. 2d 1382, 1383 (J.P.M.L. 2009) ("common factual questions arising from the performance of Apple's iPhone 3G on AT & T's 3G network"). Other examples include:

- *In re Apple Inc. Device Performance Litig.*, 291 F. Supp. 3d 1371, 1372 (J.P.M.L. 2018) (actions "share factual questions arising from allegations that Apple included code in updates to iOS that significantly reduced the performance of older-model iPhones").

- *In re iPhone/iPad Application Consumer Privacy Litig.*, 802 F. Supp. 2d 1363, 1364 (J.P.M.L. 2011) (common "allegations that Apple allowed third-party application developers to collect, transmit, and misuse personal identifying information from iPhone and iPad users").

14

- *In re Apple iPhone 4 Prods. Liab. Litig.*, 746 F. Supp. 2d 1357 (J.P.M.L. 2010) ("common factual questions arising from the performance of the iPhone 4, manufactured by Apple, on the AT & T Mobility network").

- *In re Apple iPod Nano Prods. Liab. Litig.,* 429 F. Supp. 2d 1366, 1368 (J.P.M.L. 2006) (common "factual questions regarding allegations that (1) the iPod nano … is defective because it scratches excessively with normal use; (2) Apple failed to disclose and repair this alleged defect; and (3) Apple failed to abide by the iPod nano's warranty").

The Northern District of California is the sole jurisdiction common to all of the Actions: no other district has a geographic connection to more than one case.[5] In light of these considerations, the center of gravity is the Northern District of California, which is thus the most appropriate transferee forum.

### B. The Northern District of California Is Best Positioned to Ensure Expeditious Handling of the MDL.

The Northern District of California has the resources, judicial expertise, and experience to manage a multidistrict litigation involving the Apple App Store issues here efficiently. To effectuate the purpose of Section 1407, the Panel often looks to a transferee forum "with the capacity and experience to steer [the] litigation on a prudent course." *In re Janus Mut. Funds Inv. Litig.*, 310 F. Supp. 2d 1359, 1361-62 (J.P.M.L. 2004) (making a determination of the transferee forum and judges not based on where actions were pending, but after "search[ing] a transferee district with the capacity and experience to steer this litigation on a prudent course"); *see also In re: Biomet M2a*, 896 F. Supp. 2d at 1340-41; *In re Baycol Prods. Liab. Litig.*, 180 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001) (transferring to a district court that "possesse[d] the necessary resources, facilities and technology" to handle the matter).

---

[5] While Plaintiffs' counsel are located in Alabama, convenience of counsel is *not* a salient factor in the Panel's decision "whether to order transfer or in the selection of a transferee forum for a group of actions." *In re Anthracite Coal Antitrust Litig.*, 436 F. Supp. 402, 403 (J.P.M.L. 1977) (denying transfer to district where majority of attorneys located).



Compared to the jurisdictions where the Actions are pending, the Northern District of California has the most MDL case experience, *see* Figure 1 above[6]—suggesting that it is well-positioned to adjudicate MDL cases efficiently. The District's significant prior experience with Apple, multidistrict litigation, and complex class action cases also increases the chances of an efficient disposition. *See In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig. (No. II)*, 289 F. Supp. 3d 1335, 1337 (J.P.M.L. 2018) (transferring actions to judge presiding over action involving same products at issue); *In re German Auto. Manufacturers Antitrust Litig.*, 278 F. Supp. 3d 1373, 1375 (J.P.M.L. 2017) (transferring actions to judge presiding over action with potentially overlapping facts); *In re Glob. Crossing Ltd. Sec. Litig.*, 341 F. Supp. 2d 1357, 1358 (J.P.M.L. 2004) (transferring actions to judge who is "likely familiar with [the defendant's] business and operations").

---

[6] The data in Figure 1 is drawn from official court statistics. *See* Federal Court Management Statistics, September 2020, United States Courts, available at
https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf;
*see also* Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407, Fiscal Year 2020, United States Judicial Panel on Multidistrict Litigation, available at
https://www.jpml.uscourts.gov/sites/jpml/files/Fiscal_Year_Statistics-2020_1.pdf.

Over the past five years, several judges in the Northern District of California have presided—or currently preside—over matters concerning iOS, the App Store, and/or app developers. For example, that court presides over an individual class action litigation against Apple involving related gambling allegations. *See Taylor et al v. Apple, Inc.*, No. 3:20-CV-03906 (Seeborg, J.). It also presides over several antitrust cases involving the App Store. *See, e.g., Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640 (Rogers, J.) (antitrust action by app developer with allegations concerning App Store, in-app purchases, and Apple's third-party relationship with app developers); *In re Apple iPhone Antitrust Litigation*, 4:11-CV-06714 (Rogers, J.) (antitrust action by iPhone owners with allegations concerning Apple's third-party relationship with app developers and pricing of apps in the App Store). Further, the Northern District of California is currently overseeing *In re: Apple Inc. Device Performance*, MDL No. 2827 (Davila, J.), which involves allegations about whether code in updates to iOS affected performance of older-model iPhones.

**C.   In the Alternative, The Relative Caseloads Favor Centralization in The Central District of California.**

Should the Panel consider alternative districts, the Central District of California is also close to the geographic center of the litigation, and it has the experience and capacity to oversee this MDL. The Central District of California is easily accessible from the Northern District (an hour's flight away) and would also provide reasonably convenient access to the witnesses and documentary evidence. *See In re: Countrywide Fin. Corp. Mortg. Backed Sec. Litig.*, 812 F. Supp. 2d 1380, 1384 (J.P.M.L. 2011) ("The Central District of California also is accessible for parties and witnesses located throughout the United States.").

The Central District of California also has a faster time from case filing to disposition, and from filing to trial, than the Northern District of California and the districts in which the Actions

are pending.[7] It has handled 19 MDL cases over the past five years, but has only four currently, demonstrating that the jurists within the district are experienced in complex multidistrict litigation but have capacity to handle more and that the district resolves litigation efficiently.[8]

## CONCLUSION

Because the Actions involve a common set of complex, technical facts and allegations that are subject to common defenses and motion practice, centralization of the Actions for pretrial proceedings under 28 U.S.C. § 1407 will eliminate duplicative discovery, prevent inconsistent pretrial rulings, and promote judicial economy. Therefore, Apple respectfully requests that the Panel transfer the Actions for centralization in the Northern District of California—the litigation's center of gravity—where the key witnesses, documents, and Apple's headquarters are located.

////

////

////

////

////

////

////

////

////

////

---

[7] *See* Federal Court Management Statistics, September 2020, United States Courts, available at https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf.
[8] *See* Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407, Fiscal Year 2020, United States Judicial Panel on Multidistrict Litigation, available at https://www.jpml.uscourts.gov/sites/jpml/files/Fiscal_Year_Statistics-2020_1.pdf

Dated: December 31, 2020

Respectfully submitted,

**DLA PIPER LLP (US)**

Raj N. Shah
444 West Lake Street
Suite 900
Chicago, IL 60606
T:  312.368.8904
F:  312.251.5714
E:  raj.shah@dlapiper.com

Keara M. Gordon
1251 Avenue of the Americas
New York, NY 10020
T:  212.335.4500
F:  212.335.4501
E:  keara.gordon@dlapiper.com

*/s/ John S. Gibson*
John S. Gibson
2000 Avenue of the Stars
400 North Tower
Los Angeles, CA 90067
T:  310.595.3039
F:  310.595.3339
E:  john.gibson@dlapiper.com

Brooke Kim
401 B Street, Suite 1700
San Diego, California 92101
T:  619.699.3439
F:  619.764.6739
E:  brooke.kim@dlapiper.com

*Attorneys for Defendant Apple Inc.*

# EXHIBIT A

**Legal**

# Apple Media Services Terms and Conditions

These terms and conditions create a contract between you and Apple (the "Agreement"). Please read the Agreement carefully. To confirm your understanding and acceptance of the Agreement, click "Agree."

A. INTRODUCTION TO OUR SERVICES

This Agreement governs your use of Apple's services ("Services"), through which you can buy, get, license, rent or subscribe to content, Apps (as defined below), and other in-app services (collectively, "Content"). Content may be offered through the Services by Apple or a third party. Our Services are available for your use in your country or territory of residence ("Home Country"). By creating an account for use of the Services in a particular country or territory you are specifying it as your Home Country. To use our Services, you need compatible hardware, software (latest version recommended and sometimes required) and Internet access (fees may apply). Our Services' performance may be affected by these factors.

B. USING OUR SERVICES

PAYMENTS, TAXES, AND REFUNDS

You can acquire Content on our Services for free or for a charge, either of which is referred to as a "Transaction." Each Transaction is an electronic contract between you and Apple, and/or you and the entity providing the Content on our Services. However, if you are a customer of Apple Distribution International Ltd., Apple Distribution International Ltd. is the merchant of record for the Content you acquire from certain Services (e.g., Apple Books, App Store, etc.) as displayed on the product page and/or during the acquisition process for the relevant Service. In such case, you acquire the Content from Apple Distribution International Ltd., which is licensed by the Content provider (e.g., App Provider (as defined below), book publisher, etc.). When you make your first Transaction, we will ask you to choose how frequently we should ask for your password for future Transactions. If you enable Touch ID for Transactions, we will ask you to authenticate all Transactions with your fingerprint, and if you enable Face ID for Transactions, we will ask you to authenticate all Transactions using facial recognition. Manage your password settings at any time by following these instructions: https://support.apple.com/HT204030. Apple will charge your selected payment method (such as your credit card, debit card, gift card/code, or other method available in your Home Country) for any paid Transactions, including any applicable taxes. If you have also added it to your Apple Wallet, Apple may charge your selected payment method in Apple Wallet using Apple Pay. If we cannot charge your selected payment method for any reason (such as expiration or insufficient funds), you remain responsible for any uncollected amounts, and we will attempt to charge the payment method again as you may update your payment method information. If you pre-order Content, you will be charged when the Content is delivered to you (unless you cancel prior to the Content's availability). In accordance with local law, Apple may update information regarding your selected payment method if provided such information by your financial institution. For details about how Transactions are billed, please visit http://support.apple.com/HT5582. All Transactions are final. Content prices may change at any time. If technical problems prevent or unreasonably delay delivery of Content, your exclusive and sole remedy is either replacement of the Content or refund of the price paid, as determined by Apple. From time to time, Apple may refuse a refund request if we find evidence of fraud, refund abuse, or other manipulative behavior that entitles Apple to a corresponding counterclaim. Terms

related to Store Credit and gift cards/codes are available here: https://www.apple.com/legal/internet-services/itunes/giftcards/.

ACCOUNT

Using our Services and accessing your Content may require an Apple ID. An Apple ID is the account you use across Apple's ecosystem. Use of Game Center is subject to this Agreement and also requires a Game Center account. Your account is valuable, and you are responsible for maintaining its confidentiality and security. Apple is not responsible for any losses arising from the unauthorized use of your account. Please contact Apple if you suspect that your account has been compromised.

You must be age 13 (or equivalent minimum age in your Home Country, as set forth in the registration process) to create an account and use our Services. Apple IDs for persons under this age can be created by a parent or legal guardian using Family Sharing or by an approved educational institution.

PRIVACY

Your use of our Services is subject to Apple's Privacy Policy, which is available at https://www.apple.com/legal/privacy/.

SERVICES AND CONTENT USAGE RULES

Your use of the Services and Content must follow the rules set forth in this section ("Usage Rules"). Any other use of the Services and Content is a material breach of this Agreement. Apple may monitor your use of the Services and Content to ensure that you are following these Usage Rules.

All Services:

- You may use the Services and Content only for personal, noncommercial purposes (except as set forth in the App Store Content section below).

- Apple's delivery of Services or Content does not transfer any commercial or promotional use rights to you, and does not constitute a grant or waiver of any rights of the copyright owners.

- You can use Content from up to five different Apple IDs on each device.

- For any Service, you can have up to 10 devices (but only a maximum of 5 computers) signed in with your Apple ID at one time, though simultaneous streams or downloads of Content may be limited to a lower number of devices as set out below under Apple Music and Apple TV content. Each computer must also be authorized using the same Apple ID (to learn more about authorization of computers, visit https://support.apple.com/HT201251). Devices can be associated with a different Apple ID once every 90 days.

- Manipulating play counts, downloads, ratings, or reviews via any means — such as (i) using a bot, script, or automated process; or (ii) providing or accepting any kind of compensation or incentive — is prohibited.

- It is your responsibility not to lose, destroy, or damage Content once downloaded. We encourage you to back up your Content regularly.

- You may not tamper with or circumvent any security technology included with the Services.

- You may access our Services only using Apple's software, and may not modify or use modified versions of such software.

- Video Content requires an HDCP connection.

Audio and Video Content Sales and Rentals:

- You can use Digital Rights Management (DRM)-free Content on a reasonable number of compatible devices that you own or control. DRM-protected Content can be used on up to five computers and any

number of devices that you sync to from those computers.

- Content rentals are viewable on a single device at a time, and must be played within 30 days, and completed within 48 hours of the start of play (stopping, pausing or restarting does not extend this period).

- You may burn an audio playlist of purchased music to disc for listening purposes up to seven times; this limitation does not apply to DRM-free Content.  Other Content may not be burned to disc.

App Store Content:

- The term "Apps" includes apps and app clips for any Apple platform and/or operating system, including any in-app purchases, extensions (such as keyboards), stickers, and subscriptions made available in such apps or app clips.

- Individuals acting on behalf of a commercial enterprise, governmental organization or educational institution (an "Enterprise") may download and sync non-Arcade Apps for use by either (i) a single individual on one or more devices owned or controlled by an Enterprise; or (ii) multiple individuals on a single shared device owned or controlled by an Enterprise. For the sake of clarity, each device used serially or collectively by multiple users requires a separate license.

Apple Music:

- An Individual Apple Music membership allows you to stream on a single device at a time; a Family membership allows you or your Family members to stream on up to six devices at a time.

Apple Arcade:

- Apple Arcade Apps may only be downloaded, or redownloaded, with a valid Apple Arcade trial or subscription.

- If your subscription ends, Apps downloaded via Apple Arcade will no longer be accessible to you.

Apple TV Content:

- For most channels, you can stream Content on up to three devices simultaneously.

- Learn more about Apple TV Content Usage Rules at https://support.apple.com/HT210074.

DOWNLOADS

You may be limited in the amount of Content you may download, and some downloaded Content may expire after a given amount of time after downloaded or first played. Certain Content may not be available for download at all.

You may be able to redownload previously acquired Content ("Redownload") to your devices that are signed in with the same Apple ID ("Associated Devices"). You can see Content types available for Redownload in your Home Country at https://support.apple.com/HT204632. Content may not be available for Redownload if that Content is no longer offered on our Services.

SUBSCRIPTIONS

The Services and certain Apps may allow you to purchase access to Content or Services on a subscription basis ("Paid Subscriptions"). Paid Subscriptions automatically renew until cancelled in the Manage Subscriptions section of your account settings. To learn more about cancelling your subscriptions, visit https://support.apple.com/HT202039.  We will notify you if the price of a Paid Subscription increases and, if required, seek your consent to continue. You will be charged no more than 24 hours prior to the start of the latest Paid Subscription period. If we cannot charge your payment method for any reason (such as expiration or insufficient funds), and you have not cancelled the Paid Subscription, you remain responsible for any uncollected amounts, and we will attempt to charge the payment method as you may update your

payment method information. This may result in a change to the start of your next Paid Subscription period and may change the date on which you are billed for each period.  We reserve the right to cancel your Paid Subscription if we are unable to successfully charge your payment method to renew your subscription. Certain Paid Subscriptions may offer a free trial prior to charging your payment method. If you decide to unsubscribe from a Paid Subscription before we start charging your payment method, cancel the subscription at least 24 hours before the free trial ends.

If you start a free trial to a Paid Subscription offered by Apple as Content provider (an "Apple Paid Subscription") and cancel before it ends, you cannot reactivate the free trial.

Free trials or free offers to Apple Paid Subscriptions, excluding iCloud, cannot be combined with any free trials or offers of Apple One.  If you are in a free trial or free offer for any Apple Paid Subscriptions, and you subscribe to Apple One, your free trial(s) or offer(s) will not be paused even if you have access to such Apple Paid Subscription(s) through your Apple One subscription.  You acknowledge that your free trial or free offer may expire while you are a Paid Subscriber to Apple One, and Apple shall have no obligation to reinstate, reimburse, or otherwise compensate you for any part of such expired free trial or free offer.

When your Paid Subscription to any Service ends, you will lose access to any functionality or Content of that Service that requires a Paid Subscription.

CONTENT AND SERVICE AVAILABILITY

Terms found in this Agreement that relate to Services, Content types, features or functionality not available in your Home Country are not applicable to you unless and until they become available to you. To see the Content types available to you in your Home Country, go to the Services or visit https://support.apple.com/HT204411. Certain Services and Content available to you in your Home Country may not be available to you when traveling outside of your Home Country.

THIRD-PARTY DEVICES AND EQUIPMENT

If you use our Services on a non-Apple-branded device, you may not be able to access all features or Content types. Terms in this Agreement relating to unavailable features or Content types are not applicable to you. If you later choose to access our Services from an Apple-branded device, you agree that all terms of this Agreement will apply to your use on such device.  Additionally, certain Services may require, direct, or suggest you use third-party equipment in some circumstances and/or for certain activities; such use is subject to the terms and conditions of such equipment and should be made in accordance with the applicable manufacturer's instructions.

C. YOUR SUBMISSIONS TO OUR SERVICES

Our Services may allow you to submit or post materials such as comments, ratings and reviews, pictures, videos, and podcasts (including associated metadata and artwork). Your use of such features must comply with the Submissions Guidelines below, which may be updated from time to time. If you see materials that do not comply with the Submissions Guidelines, please use the Report a Concern feature. You hereby grant Apple a worldwide, royalty-free, perpetual, nonexclusive license to use the materials you submit within the Services and related marketing, and Apple internal purposes. Apple may monitor and decide to remove or edit any submitted material.

Submissions Guidelines: You may not use the Services to:

- post any materials that (i) you do not have permission, right or license to use, or (ii) infringe on the rights of any third party;

- post objectionable, offensive, unlawful, deceptive, inaccurate, or harmful content;

- post personal, private or confidential information belonging to others;

- request personal information from a minor;

- impersonate or misrepresent your affiliation with another person, or entity;

- post or transmit spam, including but not limited to unsolicited or unauthorized advertising, promotional materials, or informational announcements;

- post, modify, or remove a rating or review in exchange for any kind of compensation or incentive;

- post a fake rating or review;

- plan or engage in any illegal, fraudulent, or manipulative activity.

D. FAMILY SHARING

The organizer of a Family ("Organizer") must be 18 years or older and the parent or legal guardian of any Family member under age 13 or the equivalent minimum age in their Home Country (as set forth in the registration process). Apple devices are required for access to all of the Family Sharing features.

Purchase Sharing: Family Sharing's Purchase Sharing feature allows you to share eligible Content among up to six members of a Family. The Organizer invites other members to participate, and agrees to pay for all Transactions initiated by Family members. The Organizer's payment method is used to pay for any Transaction initiated by a Family member (except when the Family member's account has store credit, which is always used first). Family members are acting as agents for the Organizer when the Organizer's payment method is used. The Organizer hereby agrees (1) to pay for such Transactions, and (2) that Transactions initiated by Family members are authorized. Organizers are responsible for complying with their payment method contract, and assume all risk related to sharing access to the payment method with Family members. A receipt or invoice for any Family member Transaction is sent to the initiating Family member and the Organizer.

Ask to Buy: Ask to Buy is a convenient feature that allows an Organizer to approve Transactions initiated by a Family member under age 18 (or the equivalent age of majority in your Home Country). The Organizer must be the parent or legal guardian of any Family member for whom Ask to Buy is activated. Content shared by Family members or acquired via content codes may not be subject to Ask to Buy.

Family Member changes: When a Family member leaves or is removed from the Family, the remaining Family members may no longer be able to access the former member's Content, including Content acquired with the Organizer's payment method.

Family Sharing Rules: You can only belong to one Family at a time, and may join any Family no more than twice per year. You can change the Apple ID you associate with a Family no more than once every 90 days. All Family members must share the same Home Country. Not all Content, including In-App Purchases, subscriptions, and some previously acquired Apps, are eligible for Purchase Sharing. Apple TV+, Apple TV Channels, Apple One Family, Apple One Premier, Apple Music Family, Apple Arcade, and Apple News+ subscriptions are automatically enabled for Family Sharing. Subscriptions shared by a Family may be subject to Content usage limitations on a per subscription basis.

E. PERSONALIZED RECOMMENDATION FEATURES

The Services may recommend Content to you based on your downloads, purchases and other activities. You may opt out from receiving such personalized recommendations for some Services in your account settings.

Some recommendation features may require your permission before they are turned on. If you turn on these features, you will be asked to give Apple permission to collect and store certain data, including but not limited to data about your device activity, location, and usage. Please carefully read the information presented when you turn on these features.

F. ADDITIONAL ITUNES STORE TERMS

SEASON PASS AND MULTI-PASS

A Pass allows you to purchase and receive television Content as it becomes available. A Season Pass applies to television Content that has a limited number of episodes per season; a Multi-Pass applies to television Content that is available on an ongoing basis. The full price of a Season Pass or Multi-Pass is charged at the time of the Transaction. Season Pass or Multi-Pass Content is available for download up to 90 days after the last episode becomes available. If automatic renewal is selected when you obtain a Multi-Pass, you will be charged the full price of each subsequent Multi-Pass cycle. You can turn off automatic renewal at least 24 hours prior to the beginning of the next Multi-Pass cycle in your account settings. If a Content provider delivers to Apple fewer TV episodes than planned when you purchased a Season Pass, we will credit to your Apple ID the retail value of the corresponding number of episodes that were not provided to Apple.

G. ADDITIONAL APP STORE TERMS (EXCLUDING APPLE ARCADE APPS)

LICENSE OF APP STORE CONTENT

App licenses are provided to you by Apple or a third party developer ("App Provider"). If you are a customer of Apple Distribution International Ltd., the merchant of record is Apple Distribution International Ltd., which means that you acquire the App license from Apple Distribution International Ltd., but the App is licensed by the App Provider. An App licensed by Apple is an "Apple App;" an App licensed by an App Provider is a "Third Party App." Apple acts as an agent for App Providers in providing the App Store and is not a party to the sales contract or user agreement between you and the App Provider. Any App that you acquire is governed by the Licensed Application End User License Agreement ("Standard EULA") set forth below, unless Apple or the App Provider provides an overriding custom license agreement ("Custom EULA"). The App Provider of any Third Party App is solely responsible for its content, warranties, and claims that you may have related to the Third Party App. You acknowledge and agree that Apple is a third-party beneficiary of the Standard EULA or Custom EULA applicable to each Third Party App and may therefore enforce such agreement. Certain Apps, such as stickers and iMessage apps, may not appear on the device springboard but can be accessed and used in the Messages app drawer.

IN-APP PURCHASES

Apps may offer content, services or functionality for use within such Apps ("In-App Purchases"). In-App Purchases that are consumed during the use of the App (for example, virtual gems) cannot be transferred among devices and can be downloaded only once. You must authenticate your account before making In-App Purchases – separate from any authentication to obtain other Content – by entering your password or using Touch ID or Face ID. You will be able to make additional In-App Purchases for fifteen minutes without re-authenticating unless you've asked us to require a password for every purchase or have enabled Touch ID or Face ID. You can turn off the ability to make In-App Purchases by following these instructions: https://support.apple.com/HT201304.

APP MAINTENANCE AND SUPPORT

Apple is responsible for providing maintenance and support for Apple Apps only, or as required under applicable law. App Providers are responsible for providing maintenance and support for Third Party Apps.

APP BUNDLES

Some Apps may be sold together as a bundle ("App Bundle"). The price displayed with an App Bundle is the price you will be charged upon purchasing the App Bundle. The App Bundle price may be reduced to account for Apps you have already purchased or acquired, but may include a minimum charge to complete the App Bundle.

LICENSED APPLICATION END USER LICENSE AGREEMENT

Apps made available through the App Store are licensed, not sold, to you. Your license to each App is subject to your prior acceptance of either this Licensed Application End User License Agreement ("Standard EULA"), or a custom end user license agreement between you and the Application Provider

("Custom EULA"), if one is provided. Your license to any Apple App under this Standard EULA or Custom EULA is granted by Apple, and your license to any Third Party App under this Standard EULA or Custom EULA is granted by the Application Provider of that Third Party App. Any App that is subject to this Standard EULA is referred to herein as the "Licensed Application." The Application Provider or Apple as applicable ("Licensor") reserves all rights in and to the Licensed Application not expressly granted to you under this Standard EULA.

a. Scope of License: Licensor grants to you a nontransferable license to use the Licensed Application on any Apple-branded products that you own or control and as permitted by the Usage Rules. The terms of this Standard EULA will govern any content, materials, or services accessible from or purchased within the Licensed Application as well as upgrades provided by Licensor that replace or supplement the original Licensed Application, unless such upgrade is accompanied by a Custom EULA. Except as provided in the Usage Rules, you may not distribute or make the Licensed Application available over a network where it could be used by multiple devices at the same time. You may not transfer, redistribute or sublicense the Licensed Application and, if you sell your Apple Device to a third party, you must remove the Licensed Application from the Apple Device before doing so. You may not copy (except as permitted by this license and the Usage Rules), reverse-engineer, disassemble, attempt to derive the source code of, modify, or create derivative works of the Licensed Application, any updates, or any part thereof (except as and only to the extent that any foregoing restriction is prohibited by applicable law or to the extent as may be permitted by the licensing terms governing use of any open-sourced components included with the Licensed Application).

b. Consent to Use of Data: You agree that Licensor may collect and use technical data and related information—including but not limited to technical information about your device, system and application software, and peripherals—that is gathered periodically to facilitate the provision of software updates, product support, and other services to you (if any) related to the Licensed Application. Licensor may use this information, as long as it is in a form that does not personally identify you, to improve its products or to provide services or technologies to you.

c. Termination. This Standard EULA is effective until terminated by you or Licensor. Your rights under this Standard EULA will terminate automatically if you fail to comply with any of its terms.

d. External Services. The Licensed Application may enable access to Licensor's and/or third-party services and websites (collectively and individually, "External Services"). You agree to use the External Services at your sole risk. Licensor is not responsible for examining or evaluating the content or accuracy of any third-party External Services, and shall not be liable for any such third-party External Services. Data displayed by any Licensed Application or External Service, including but not limited to financial, medical and location information, is for general informational purposes only and is not guaranteed by Licensor or its agents. You will not use the External Services in any manner that is inconsistent with the terms of this Standard EULA or that infringes the intellectual property rights of Licensor or any third party. You agree not to use the External Services to harass, abuse, stalk, threaten or defame any person or entity, and that Licensor is not responsible for any such use. External Services may not be available in all languages or in your Home Country, and may not be appropriate or available for use in any particular location. To the extent you choose to use such External Services, you are solely responsible for compliance with any applicable laws. Licensor reserves the right to change, suspend, remove, disable or impose access restrictions or limits on any External Services at any time without notice or liability to you.

e. NO WARRANTY: YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT USE OF THE LICENSED APPLICATION IS AT YOUR SOLE RISK. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE LICENSED APPLICATION AND ANY SERVICES PERFORMED OR PROVIDED BY THE LICENSED APPLICATION ARE PROVIDED "AS IS" AND "AS AVAILABLE," WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, AND LICENSOR HEREBY DISCLAIMS ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE LICENSED APPLICATION AND ANY SERVICES, EITHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, OF SATISFACTORY QUALITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF

ACCURACY, OF QUIET ENJOYMENT, AND OF NONINFRINGEMENT OF THIRD-PARTY RIGHTS. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY LICENSOR OR ITS AUTHORIZED REPRESENTATIVE SHALL CREATE A WARRANTY. SHOULD THE LICENSED APPLICATION OR SERVICES PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR, OR CORRECTION. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES OR LIMITATIONS ON APPLICABLE STATUTORY RIGHTS OF A CONSUMER, SO THE ABOVE EXCLUSION AND LIMITATIONS MAY NOT APPLY TO YOU.

f. Limitation of Liability. TO THE EXTENT NOT PROHIBITED BY LAW, IN NO EVENT SHALL LICENSOR BE LIABLE FOR PERSONAL INJURY OR ANY INCIDENTAL, SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF DATA, BUSINESS INTERRUPTION, OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO YOUR USE OF OR INABILITY TO USE THE LICENSED APPLICATION, HOWEVER CAUSED, REGARDLESS OF THE THEORY OF LIABILITY (CONTRACT, TORT, OR OTHERWISE) AND EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OF LIABILITY FOR PERSONAL INJURY, OR OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THIS LIMITATION MAY NOT APPLY TO YOU. In no event shall Licensor's total liability to you for all damages (other than as may be required by applicable law in cases involving personal injury) exceed the amount of fifty dollars ($50.00). The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

g. You may not use or otherwise export or re-export the Licensed Application except as authorized by United States law and the laws of the jurisdiction in which the Licensed Application was obtained. In particular, but without limitation, the Licensed Application may not be exported or re-exported (a) into any U.S.-embargoed countries or (b) to anyone on the U.S. Treasury Department's Specially Designated Nationals List or the U.S. Department of Commerce Denied Persons List or Entity List. By using the Licensed Application, you represent and warrant that you are not located in any such country or on any such list. You also agree that you will not use these products for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture, or production of nuclear, missile, or chemical or biological weapons.

h. The Licensed Application and related documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein. Unpublished-rights reserved under the copyright laws of the United States.

i. Except to the extent expressly provided in the following paragraph, this Agreement and the relationship between you and Apple shall be governed by the laws of the State of California, excluding its conflicts of law provisions. You and Apple agree to submit to the personal and exclusive jurisdiction of the courts located within the county of Santa Clara, California, to resolve any dispute or claim arising from this Agreement. If (a) you are not a U.S. citizen; (b) you do not reside in the U.S.; (c) you are not accessing the Service from the U.S.; and (d) you are a citizen of one of the countries identified below, you hereby agree that any dispute or claim arising from this Agreement shall be governed by the applicable law set forth below, without regard to any conflict of law provisions, and you hereby irrevocably submit to the non-exclusive jurisdiction of the courts located in the state, province or country identified below whose law governs:

If you are a citizen of any European Union country or Switzerland, Norway or Iceland, the governing law and forum shall be the laws and courts of your usual place of residence.

Specifically excluded from application to this Agreement is that law known as the United Nations Convention on the International Sale of Goods.

H. ADDITIONAL TERMS FOR CERTAIN CONTENT ACQUIRED FROM THIRD PARTIES

Some Content available in certain Services are acquired by You from the third-party provider of such Content (as displayed on the product page and/or during the acquisition process for the relevant Content), not Apple.  For example, Apple Books Content is acquired from book publishers, not Apple. In such case, Apple acts as an agent for the Content provider in providing the Content to you, and therefore Apple is not a party to the Transaction between you and the Content provider. However, if you are a customer of Apple Distribution International Ltd., Apple Distribution International Ltd. is the merchant of record for the Content you acquire from certain Services (e.g., Apple Books), but such Content is licensed by the Content provider.  The Content provider reserves the right to enforce the terms of use relating to such Content. The Content provider is solely responsible for such Content, any warranties to the extent that such warranties have not been disclaimed, and any claims that you or any other party may have relating to such Content.

I. ADDITIONAL APPLE MUSIC TERMS

iCloud Music Library is an Apple Music feature that allows you to access your matched or uploaded songs, playlists and music videos acquired from Apple Music, the iTunes Store or another source ("iCloud Music Library Content") on your Apple Music-enabled devices. iCloud Music Library is turned on automatically when you set up your Apple Music membership. iCloud Music Library collects information about your iCloud Music Library Content. This information is associated with your Apple ID, and compared to iCloud Music Library Content currently available on Apple Music. iCloud Music Library Content that is not matched is uploaded to Apple's iCloud Music Library servers (in a format determined by Apple). You can upload up to 100,000 songs. Songs acquired from the iTunes Store or Apple Music do not count against this limit. Songs that do not meet certain criteria (for example, excessively large files) or that are not authorized for your device are not eligible for iCloud Music Library. When you use iCloud Music Library, Apple logs information such as the tracks you play, stop or skip, the devices you use, and the time and duration of playback. You agree to use iCloud Music Library only for lawfully acquired content. iCloud Music Library is provided on an "AS IS" basis and could contain errors or inaccuracies. You should back up your data and information prior to using iCloud Music Library. If you are not an Apple Music member, you may purchase an iTunes Match subscription, which is subject to the terms set forth in this section. When your Apple Music membership ends, you will lose access to to your iCloud Music Library, including iCloud Music Library Content that is uploaded to iCloud Music Library servers.

J. ADDITIONAL APPLE FITNESS+ TERMS

Apple Fitness+ is for entertainment and/or informational purposes only and is not intended to provide any medical advice. You should always seek the advice of an appropriately qualified healthcare professional regarding (a) the safety and advisability of any given activity, or (b) any specific medical condition or symptoms.

K. CARRIER MEMBERSHIP

Where available, you may be offered to purchase a Service membership from your wireless carrier (a "Carrier Membership"). If you purchase a Carrier Membership, your carrier is the merchant of record, which means that you acquire the Service license from your carrier, which will bill you for the cost of your Service membership, but the Service is provided by Apple. Your purchase relationship with the carrier is governed by the carrier's terms and conditions, not this Agreement, and any billing disputes related to a Carrier Membership must be directed to your carrier, not Apple. By using a Service through a Carrier Membership, you agree that your carrier may exchange your carrier account information, telephone number and subscription information with Apple, and that Apple may use this information to determine the status of your Carrier Membership.

L. MISCELLANEOUS TERMS APPLICABLE TO ALL SERVICES

DEFINITION OF APPLE

Depending on your Home Country, "Apple" means:

Apple Inc., located at One Apple Park Way, Cupertino, California, for users in the United States, including Puerto Rico;

Apple Canada Inc., located at 120 Bremner Blvd., Suite 1600, Toronto ON M5J 0A8, Canada for users in Canada;

Apple Services LATAM LLC, located at 1 Alhambra Plaza, Ste 700 Coral Gables, Florida, for users in Mexico, Central or South America, or any Caribbean country or territory (excluding Puerto Rico);

iTunes K.K., located at Roppongi Hills, 6-10-1 Roppongi, Minato-ku, Tokyo 106-6140, Tokyo for users in Japan;

Apple Pty Limited, located at Level 3, 20 Martin Place, Sydney NSW 2000, Australia, for users in Australia or New Zealand, including in any of their territories or affiliated jurisdictions; and

Apple Distribution International Ltd., located at Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, for all other users.

CONTRACT CHANGES

Apple reserves the right at any time to modify this Agreement and to add new or additional terms or conditions on your use of the Services. Such modifications and additional terms and conditions will be effective immediately and incorporated into this Agreement. Your continued use of the Services will be deemed acceptance thereof.

THIRD-PARTY MATERIALS

Apple is not responsible or liable for third party materials included within or linked from the Content or the Services.

INTELLECTUAL PROPERTY

You agree that the Services, including but not limited to Content, graphics, user interface, audio clips, video clips, editorial content, and the scripts and software used to implement the Services, contain proprietary information and material that is owned by Apple and/or its licensors, and is protected by applicable intellectual property and other laws, including but not limited to copyright. You agree that you will not use such proprietary information or materials in any way whatsoever except for use of the Services for personal, noncommercial uses in compliance with this Agreement. No portion of the Services may be reproduced in any form or by any means, except as expressly permitted by this Agreement. You agree not to modify, rent, loan, sell, or distribute the Services or Content in any manner, and you shall not exploit the Services in any manner not expressly authorized.

The Apple name, the Apple logo, iTunes, iTunes Store, App Store, Apple Books, Apple Music, Apple TV, Apple TV+, Apple Arcade, Apple News, Apple News+, Apple One, Apple Podcasts, and other Apple trademarks, service marks, graphics, and logos used in connection with the Services are trademarks or registered trademarks of Apple in the U.S. and other countries throughout the world. You are granted no right or license with respect to any of the aforesaid trademarks.

COPYRIGHT

Unless otherwise noted, Services and Content provided by Apple are © Apple Inc. and its subsidiaries.

If you believe that any Content available through the Services infringe a copyright claimed by you, please contact Apple at the following locations:

- Third Party Apps: https://www.apple.com/legal/internet-services/itunes/appstorenotices/

- Apple Books: https://www.apple.com/legal/internet-services/itunes/applebooksnotices/

- Apple TV+: https://www.apple.com/legal/internet-services/itunes/appletvplusnotices/

- Apple News: https://www.apple.com/legal/internet-services/itunes/applenewsnotices/

- All other Services (including but not limited to iTunes Store, Apple Music, and Apple Podcasts): https://www.apple.com/legal/internet-services/itunes/itunesstorenotices/

TERMINATION AND SUSPENSION OF SERVICES

If you fail, or Apple suspects that you have failed, to comply with any of the provisions of this Agreement, Apple may, without notice to you: (i) terminate this Agreement and/or your Apple ID, and you will remain liable for all amounts due under your Apple ID up to and including the date of termination; and/or (ii) terminate your license to the software; and/or (iii) preclude your access to the Services.

Apple further reserves the right to modify, suspend, or discontinue the Services (or any part or Content thereof) at any time with or without notice to you, and Apple will not be liable to you or to any third party should it exercise such rights.

DISCLAIMER OF WARRANTIES; LIABILITY LIMITATION

APPLE DOES NOT GUARANTEE, REPRESENT, OR WARRANT THAT YOUR USE OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, AND YOU AGREE THAT FROM TIME TO TIME APPLE MAY REMOVE THE SERVICES FOR INDEFINITE PERIODS OF TIME, CANCEL THE SERVICES AT ANY TIME, OR OTHERWISE LIMIT OR DISABLE YOUR ACCESS TO THE SERVICES WITHOUT NOTICE TO YOU.

YOU EXPRESSLY AGREE THAT YOUR USE OF, OR INABILITY TO USE, OR ACTIVITY IN CONNECTION WITH THE SERVICES IS AT YOUR SOLE RISK. THE SERVICES AND ALL CONTENT DELIVERED TO YOU THROUGH THE SERVICES ARE (EXCEPT AS EXPRESSLY STATED BY APPLE) PROVIDED "AS IS" AND "AS AVAILABLE" FOR YOUR USE, WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NONINFRINGEMENT. BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, THE ABOVE EXCLUSION OF IMPLIED WARRANTIES MAY NOT APPLY TO YOU.

IN NO CASE SHALL APPLE, ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, AGENTS, CONTRACTORS, OR LICENSORS BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING FROM YOUR USE OF ANY OF THE SERVICES OR FOR ANY OTHER CLAIM RELATED IN ANY WAY TO YOUR USE OF THE SERVICES AND/OR CONTENT, INCLUDING, BUT NOT LIMITED TO, ANY ERRORS OR OMISSIONS IN ANY CONTENT, OR ANY INJURY, LOSS OR DAMAGE OF ANY KIND INCURRED AS A RESULT OF THE USE OF ANY CONTENT POSTED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE VIA THE SERVICES, EVEN IF ADVISED OF THEIR POSSIBILITY. BECAUSE SOME COUNTRIES, STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH COUNTRIES, STATES OR JURISDICTIONS, APPLE'S LIABILITY SHALL BE LIMITED TO THE EXTENT SUCH LIMITATION IS PERMITTED BY LAW.

APPLE SHALL USE REASONABLE EFFORTS TO PROTECT INFORMATION SUBMITTED BY YOU IN CONNECTION WITH THE SERVICES, BUT YOU AGREE THAT YOUR SUBMISSION OF SUCH INFORMATION IS AT YOUR SOLE RISK, AND YOU HEREBY RELEASE APPLE FROM ANY AND ALL LIABILITY TO YOU FOR ANY LOSS OR LIABILITY RELATING TO SUCH INFORMATION IN ANY WAY.

APPLE DOES NOT REPRESENT OR GUARANTEE THAT THE SERVICES WILL BE FREE FROM LOSS, CORRUPTION, ATTACK, VIRUSES, INTERFERENCE, HACKING, OR OTHER SECURITY INTRUSION, AND YOU HEREBY RELEASE APPLE FROM ANY LIABILITY RELATING THERETO. YOU SHALL BE RESPONSIBLE FOR BACKING UP YOUR OWN SYSTEM, INCLUDING ANY CONTENT ACQUIRED OR RENTED THROUGH THE SERVICES.

APPLE IS NOT RESPONSIBLE FOR DATA CHARGES YOU MAY INCUR IN CONNECTION WITH YOUR USE OF THE SERVICES.

WAIVER AND INDEMNITY

BY USING THE SERVICES, YOU AGREE, TO THE EXTENT PERMITTED BY LAW, TO INDEMNIFY AND HOLD APPLE, ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, AGENTS, CONTRACTORS, AND LICENSORS HARMLESS WITH RESPECT TO ANY CLAIMS ARISING OUT OF YOUR BREACH OF THIS AGREEMENT, YOUR USE OF THE SERVICES, OR ANY ACTION TAKEN BY APPLE AS PART OF ITS INVESTIGATION OF A SUSPECTED VIOLATION OF THIS AGREEMENT OR AS A RESULT OF ITS FINDING OR DECISION THAT A VIOLATION OF THIS AGREEMENT HAS OCCURRED. YOU AGREE THAT YOU SHALL NOT SUE OR RECOVER ANY DAMAGES FROM APPLE, ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, AGENTS, CONTRACTORS, AND LICENSORS AS A RESULT OF ITS DECISION TO REMOVE OR REFUSE TO PROCESS ANY INFORMATION OR CONTENT, TO WARN YOU, TO SUSPEND OR TERMINATE YOUR ACCESS TO THE SERVICES, OR TO TAKE ANY OTHER ACTION DURING THE INVESTIGATION OF A SUSPECTED VIOLATION OR AS A RESULT OF APPLE'S CONCLUSION THAT A VIOLATION OF THIS AGREEMENT HAS OCCURRED. THIS WAIVER AND INDEMNITY PROVISION APPLIES TO ALL VIOLATIONS DESCRIBED IN OR CONTEMPLATED BY THIS AGREEMENT.

STATUTORY EXCEPTIONS FOR PUBLIC INSTITUTIONS

If you are a qualified public educational or government institution and any part of this Agreement, such as, by way of example, all or part of the indemnification section, is invalid or unenforceable against you because of applicable local, national, state or federal law, then that portion shall be deemed invalid or unenforceable, as the case may be, and instead construed in a manner most consistent with applicable governing law.

GOVERNING LAW

Except to the extent expressly provided in the following paragraph, this Agreement and the relationship between you and Apple, and all Transactions on the Services shall be governed by the laws of the State of California, excluding its conflicts of law provisions. You and Apple agree to submit to the personal and exclusive jurisdiction of the courts located within the county of Santa Clara, California, to resolve any dispute or claim arising from this Agreement. If (a) you are not a U.S. citizen; (b) you do not reside in the U.S.; (c) you are not accessing the Service from the U.S.; and (d) you are a citizen of one of the countries identified below, you hereby agree that any dispute or claim arising from this Agreement shall be governed by the applicable law set forth below, without regard to any conflict of law provisions, and you hereby irrevocably submit to the non-exclusive jurisdiction of the courts located in the state, province or country identified below whose law governs:

If you are a citizen of any European Union country or Switzerland, Norway or Iceland, the governing law and forum shall be the laws and courts of your usual place of residence.

Specifically excluded from application to this Agreement is that law known as the United Nations Convention on the International Sale of Goods.

OTHER PROVISIONS

This Agreement constitutes the entire agreement between you and Apple and governs your use of the Services, superseding any prior agreements with respect to the same subject matter between you and Apple. You also may be subject to additional terms and conditions that may apply when you use affiliate services, third-party content, third-party software, or additional services such as the Volume Purchase Program. If any part of this Agreement is held invalid or unenforceable, that portion shall be construed in a manner consistent with applicable law to reflect, as nearly as possible, the original intentions of the parties, and the remaining portions shall remain in full force and effect. Apple's failure to enforce any right or provisions in this Agreement will not constitute a waiver of such or any other provision. Apple will not be responsible for failures to fulfill any obligations due to causes beyond its control.

You agree to comply with all local, state, federal, and national laws, statutes, ordinances, and regulations that apply to your use of the Services. Your use of the Services may also be subject to other laws. Risk of

loss for all electronically delivered Transactions pass to the acquirer upon electronic transmission to the recipient. No Apple employee or agent has the authority to vary this Agreement.

Apple may notify you with respect to the Services by sending an email message to your email address or a letter via postal mail to your mailing address, or by a posting on the Services. Notices shall become effective immediately. Apple may also contact you by email or push notification to send you additional information about the Services.

You hereby grant Apple the right to take steps Apple believes are reasonably necessary or appropriate to enforce and/or verify compliance with any part of this Agreement. You agree that Apple has the right, without liability to you, to disclose any data and/or information to law enforcement authorities, government officials, and/or a third party, as Apple believes is reasonably necessary or appropriate to enforce and/or verify compliance with any part of this Agreement (including but not limited to Apple's right to cooperate with any legal process relating to your use of the Services and/or Content, and/or a third-party claim that your use of the Services and/or Content is unlawful and/or infringes such third party's rights).

Children under the age of majority should review this Agreement with their parent or guardian to ensure that the child and parent or legal guardian understand it.

Last Updated: September 16, 2020

Legal     Internet Services     Apple Media Services

**Hardware and Software**

Hardware Warranties

Software License Agreements

RF Exposure

**More Resources**

Overview

Government Information Requests

Contact Apple Legal

Global Trade Compliance

Supplier Provisions

Filemaker Legal Information

**Sales & Support**

Overview

AppleCare

Repair Terms and Conditions

Express Replacement Service

Remote Support Terms and Conditions (PDF)

Sales Policies

Certification Agreements and Policies

Training Service Terms and Conditions

Support Communities Terms of Use

**Internet Services**

Overview

Apple Media Services Terms and Conditions

iTunes Gift Cards and Codes Terms and Conditions

Game Center Terms and Conditions

iCloud Terms of Service

TestFlight Terms and Conditions

Privacy Policy

Website Terms of Use

**Intellectual Property**

Overview

Guidelines for Using Apple Trademarks and Copyrights

Trademarks

Rights and Permissions

Piracy Prevention

Unsolicited Idea Submission Policy

**Education**

Apple School Manager

**Enterprise**

Apple Business Manager

Data Transfer Agreements

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.

Copyright © 2020 Apple Inc. All rights reserved.    Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Legal  |  Site Map       United States